# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| BRUCE S. SHERMAN and BRUCE & CYNTHIA SHERMAN CHARITABLE FOUNDATION, INC., Individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>THE FRESH MARKET, INC., RAY BERRY, RICHARD A. ANICETTI, MICHAEL CASEY, JEFFREY NAYLOR, RICHARD NOLL, BOB SASSER, ROBERT SHEARER, MICHAEL TUCCI, STEVEN TANGER, JANE THOMPSON, APOLLO GLOBAL MANAGEMENT, LLC, APOLLO MANAGEMENT VIII, L.P., POMEGRANATE HOLDINGS, INC., and POMEGRANATE MERGER SUB, INC.,<br><br>     Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(d)(4), 14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Bruce S. Sherman and Bruce & Cynthia Sherman Charitable Foundation, Inc. ("Plaintiffs"), by and through their attorneys, allege the following upon personal knowledge as to themselves, and upon information and belief as to all other allegations herein, based upon, among other things, the investigation of counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by The Fresh Market, Inc. ("Fresh Market" or "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about Fresh Market, press releases and other public statements issued by Fresh Market, media reports about Fresh Market, and a publicly filed verified complaint which incorporated information gained from an inspection of  Fresh Market's corporate books and records, and believe that substantial additional evidentiary support will exist for the allegations set forth

herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.       This is a stockholder class action brought by Plaintiffs on behalf of the former stockholders of Fresh Market against Fresh Market and the members of its former board of directors ("Board") for their violations of §§14(d)(4), 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(d)(4), 78n(e), 78t(a), and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9(d) ("Rule 14d-9") in connection with the sale of Fresh Market ("Transaction") to Pomegranate Holdings, Inc. ("Pomegranate"), an affiliate of Apollo Global Management, LLC ("Apollo Global"); Apollo Management VIII, L.P. (together with Pomegranate and Apollo Global, "Apollo"); and Pomegranate Merger Sub, Inc. ("Merger Sub" and, collectively, with Apollo, the "Apollo Defendants").

2.       Fresh Market is a specialty grocery retailer founded by Ray Berry ("R. Berry") in 1982 and controlled by the Berry family until the end of 2012, after which the family reduced its stock holdings in a public offering.  R. Berry served as Chief Executive Officer ("CEO") of the Company until 2007.  Thereafter, he continued to serve as Chairman of the Board.  R. Berry and Brett Berry ("B. Berry"), R. Berry's son and a former CEO and former Vice Chairman of the Board, collectively owned approximately 10% of Fresh Market's outstanding shares at all relevant times. R. Berry's son-in-law, Michael Barry, a former Chief Financial Officer ("CFO") and former Vice Chairman of the Board, separately owned over 6% of Fresh Market's outstanding shares.

3.       On March 14, 2016, Fresh Market announced that it had entered into a definitive agreement with Apollo ("Merger Agreement") under which Apollo, through Merger Sub, would acquire all of the outstanding shares of The Fresh Market for $28.50 per share in an all-cash

2

tender offer ("Tender Offer") through which the Company would be taken private (*i.e.*, the "Transaction"). The aggregate value of the Tender Offer was approximately $1.36 billion. The Tender Offer was commenced on March 25, 2016, expired on April 21, 2016, and the Transaction was completed on April 27, 2016.

4.     The Transaction resulted from a plan formulated by the Berrys and Apollo, whereby they excluded the possibility of any other successful bidders and agreed to work in concert to take Fresh Market private at a vulnerable time at the lowest possible price.

5.     Fresh Market's public shareholders were induced to tender their shares and/or forced to relinquish their shares in the Company as a result of the Company's recommendation and/or statements that omitted and/or misstated material information concerning, *inter alia*, the relationship between Apollo and the Berrys and the true value of Fresh Market.

6.     On March 25, 2016, Fresh Market filed with the SEC a Schedule 14D-9 Solicitation/Recommendation Statement ("14D-9"), as amended on March 31, 2016, April 4, 2016, April 5, 2016, April 11, 2016, and April 13, 2016.  The 14D-9 was false and misleading in that it failed to adequately disclose material information related to the Transaction. Specifically, the 14D-9 omitted and/or misrepresented material information concerning, among other things: (a) the sales process for the Company; (b) management's financial projections; and (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinion provided by the Company's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan").

7.     Further, the 14D-9 misled Fresh Market's public investors by omitting facts, which, if disclosed, would have belied the representation that R. Berry was truly willing to engage in an alternative transaction with a bidder other than Apollo, and would have revealed that R. Berry, B. Berry and Apollo had formulated and acted pursuant to an undisclosed plan to

buy Fresh Market at an importune time and at an artificially depressed valuation.

8.      The Board misled Fresh Market shareholders and concealed the fact that the Berrys and Apollo were an undisclosed §13(d)(3) group working together to buy Fresh Market at the lowest possible price, by highlighting and advancing the following false and/or misleading distinctions regarding R. Berry's relationship with Apollo, including that:

- R. Berry was not involved in Apollo's formulation of its proposal;

- R. Berry was not committed to participating in a transaction with Apollo;

- R. Berry was not working with Apollo on an exclusive basis; and

- R. Berry had told Apollo he would consider selling his shares for cash "at an appropriate valuation."

9.      The 14D-9 is also misleading about the management projections used by J.P. Morgan for the purposes of rendering its fairness opinion. The 14D-9 discusses the management-created financial forecasts based on the strategic plan developed by management, with the assistance of McKinsey & Co. ("McKinsey"), that were approved by the Board on December 1 and 2, 2015 and are defined as the "November 17 Management Case." The 14D-9 misleadingly suggests that the November 17 Management Case was optimistic and that the three downside scenarios disclosed in the 14D-9 provide a more reasonable basis for assessing Apollo's offer.

10.      Moreover, although Fresh Market's public shareholders were either induced to tender their shares or had those shares involuntarily taken from them at an unfair and inadequate price through false and misleading statements and omissions of material fact, Company insiders benefitted uniquely and disproportionately from the Transaction. For example, according to the press release announcing the Transaction, unlike Fresh Market's public shareholders, R. Berry and B. Berry negotiated to participate in the Transaction with Apollo by rolling over the vast majority of their Fresh Market holdings rather than tendering their shares and forfeiting their

4

equity in the Company. In exchange for an indirect ownership in Pomegranate, which acquired Fresh Market in the Transaction, the Berrys agreed to support the Transaction.

11.     In addition, the Board and members of management were motivated to effectuate the Transaction through false and misleading statements in order to secure substantial personal financial benefits, including the accelerated vesting and monetization of their illiquid equity holdings in Fresh Market and change-of-control severance payments, which, collectively, were worth over $31 million.

12.     The Board conspired with the Berrys and Apollo to deliver Fresh Market to the Berrys and Apollo, while concurrently helping to cover up their scheme.  Not only did the Board allow the Berrys and Apollo to maintain an undisclosed improper bidding advantage, but when Apollo, as expected, emerged as the sole bidder for Fresh Market and offered a price below the fair value implied by management projections, the Board obtained reduced projections from management.

13.     The Board also retained a conflicted financial advisor, J.P. Morgan, in connection with the Transaction. Over the past several years, J.P. Morgan had received over $116.7 million in fees from Apollo and, therefore, J.P. Morgan was motivated to opine that the Transaction was fair to ensure that Apollo would continue to engage J.P. Morgan in future lucrative advisory services.

14.     Thus, the 14D-9 was also false in misleading in its recommendation to Fresh Market shareholders. Specifically, in the 14D-9, Fresh Market and the Director Defendants (defined below) represented, *inter alia*, that they: (i) determined that the Transaction is fair to and in the best interests of Fresh Market and its public stockholders; (ii) declared the Merger Agreement and the Transaction advisable; and (iii) recommended that Fresh Market's

stockholders tender their shares in the Tender Offer. However, as a result of, *inter alia*, the undisclosed manipulation of the sales process and Fresh Market's forecasts, the unfair advantages afforded to Apollo, and the Berrys' backroom dealings with Apollo and *de facto* refusal to engage with an alternative bidder, the Board's purported determination that the Transaction was "fair" and advisable, and its recommendation that Fresh Market shareholders tender their shares in the Tender Offer, were false and misleading.

15.     Moreover, the Board engaged in manipulative conduct by including terms in the Merger Agreement that ensured that a transaction with Apollo would be consummated on terms preferential to Apollo. Specifically, the Board agreed to unreasonable preclusive deal protection devices in the Merger Agreement including, *inter alia*, (a) a "matching rights" provision which granted Apollo the right to revise its proposal in response to a superior alternative proposal; (b) an "information rights" provision that entitled Apollo to receive a copy of any alternative proposal as well as the material terms thereof; and (c) a provision that required the Company to pay a termination fee of $34 million if the Transaction was terminated under certain circumstances, including if the Board elected to pursue a superior proposal. Although such provisions are customary in corporate mergers, here, in light of, *inter alia*, the misrepresentations concerning the relationship between the Berrys and Apollo; R. Berry's willingness to engage with an alternative bidder; and the true/fair value for Fresh Market, these provisions served as an artifice to conceal the manipulation of the sale process in favor of the Berrys and Apollo.

16.     For these reasons and as set forth in detail herein, Plaintiffs seek to recover damages resulting from Defendants'[1] misrepresentations and omissions of material facts concerning the Transaction, which facilitated same, and resulted in the Company's public

---

[1] The Apollo Defendants (defined below) are liable for the material misrepresentations and omissions in the 14D-9 as a result of their acquisition and ownership of Fresh Market.

6

shareholders receiving inadequate consideration for their equity in Fresh Market.

## JURISDICTION AND VENUE

17.     Jurisdiction is founded upon federal question jurisdiction, pursuant to §27 of the Exchange Act, as amended, 15 U.S.C. §78aa, and 28 U.S.C. § 1331.

18.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because Defendants systematically conducted business on a regular basis in this District and/or reside in this District and the wrongful conduct complained of herein occurred in this District.

## PARTIES

19.     Plaintiffs were at all relevant times continuous stockholders of Fresh Market.

20.     Defendant Fresh Market is a Delaware corporation with its principal executive offices located at 628 Green Valley Road, Greensboro, NC 27408. On April 27, 2016, pursuant to the Merger Agreement, Merger Sub merged with and into Fresh Market with Fresh Market surviving as a wholly owned subsidiary of Pomegranate/Apollo.

21.     Defendant R. Berry has served as the Chairman of the Board of the Company since 1981.

22.     Defendant Richard A. Anicetti has served as the President, CEO, and a member of the Board of the Company.

23.     Defendant Michael Casey has served as a director of the Company since May 2015.

24.     Defendant Jeffrey Naylor has served as a director of the Company since November 2010.

25.     Defendant Richard Noll has served as a director of the Company since August 2011.

7

26.     Defendant Bob Sasser has served as a director of the Company since March 2012.

27.     Defendant Robert Shearer has served as a director of the Company since May 2015.

28.     Defendant Michael Tucci has served as a director of the Company since December 2011.

29.     Defendant Steven Tanger has served as a director of the Company since June 2012.

30.     Defendant Jane Thompson has served as a director of the Company since June 2012.

31.     Defendants Berry, Anicetti, Casey, Naylor, Noll, Sasser, Shearer, Tucci, Tanger, and Thompson are collectively referred to herein as the "Board" or the "Director Defendants."

32.     Non-party Brett Berry is the son of Ray Berry and was a former Vice Chairman, President, and CEO of Fresh Market. Among other things, Brett Berry is a party to a rollover, contribution, and exchange agreement.

33.     Defendant Apollo Global is a global alternative investment manager.

34.     Defendant Apollo Management VIII, L.P. manages certain funds that control Pomegranate and Merger Sub.

35.     Defendant Pomegranate is a Delaware corporation.  On April 27, 2016, pursuant to the Merger Agreement, Merger Sub merged with and into Fresh Market with Fresh Market surviving as a wholly owned subsidiary of Pomegranate/Apollo.

36.     Defendant Merger Sub is a Delaware corporation and wholly-owned subsidiary of Pomegranate.  On April 27, 2016, pursuant to the Merger Agreement, Merger Sub merged with

and into Fresh Market with Fresh Market surviving as a wholly owned subsidiary of Pomegranate/Apollo.

37.    Collectively, Apollo Global, Apollo Management VIII, L.P., Pomegranate, and Merger Sub are referred to herein as the "Apollo Defendants."

38.    Collectively, Fresh Market, the Director Defendants and the Apollo Defendants are referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

39.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Fed. R. Civ. P. 23 on behalf of all holders of Fresh Market shares who were harmed by Defendants' actions described below ("Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of Defendants.

40.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable. According to the Schedule TO, Tender Offer Statement, filed in connection with the Tender Offer, there were 47,049,217 common shares of Fresh Market issued and outstanding when the Tender Offer commenced. The actual number of stockholders of Fresh Market can be ascertained through discovery.

b.    There are questions of law and fact that are common to the Class, including:

i)    whether Defendants misrepresented or omitted material information concerning the Transaction in the 14D-9 in violation of Section 14(e) and 14(d)(4) of the Exchange Act and Rule 14d-9 promulgated thereunder;

9

ii)     whether Defendants violated Section 20(a) of the Exchange Act;

iii)    whether Defendants failed to obtain the best price available for the benefit of Plaintiffs and the other members of the Class in connection with the Transaction; and

iv)     whether Plaintiffs and the other members of the Class suffered financial harm when the Transaction complained of herein was consummated.

c.      Plaintiffs are adequate representatives of the Class, and have retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

d.      Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class.

e.      The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

A.              **Background**

41.     Fresh Market is a growing specialty grocery retailer focused on creating an

extraordinary food shopping experience for its customers. Since opening its first store in 1982, the Company has offered high-quality food products, with an emphasis on fresh, premium perishables and an uncompromising commitment to customer service. As of March 14, 2016, the Company operated 186 stores in 27 states across the United States.

42.     Fresh Market opened its first store in Greensboro, North Carolina in 1982. In the 1980s and early 1990s, the Company expanded its presence throughout the southeastern United States. In 1996, the Company entered Florida, where as of January 25, 2015, the Company has 40 stores, making Florida its largest market. The Company continued to introduce its store to new markets and entered the Midwest in 2005, the Northeast in 2009, the Plains states in 2012, and Texas in 2013.

43.     The Berry family owned 100% of Fresh Market's common stock until an initial public offering in November 2010. The Berry family continued to own over 40% of Fresh Market's shares until the family publicly offered an additional portion of their shares at the end of 2012.

**B.      The Beginning of the Berrys' Take-Private Scheme**

44.     On January 11, 2015, although Fresh Market's business was performing well and the Company's shares traded as high as $40.83 per share, on January 9, 2015, Fresh Market's R. Berry-led Board terminated its then-CEO and President, Craig Carlock. The termination was without cause and no details were forthcoming about the reason for the termination. Investors were surprised by the sudden firing with no permanent replacement lined up. The stock price took an immediate hit, dropping more than 11% to close at $36.16 on January 13, 2015, the first day after the termination was announced. Over the next eight months under interim leadership, Fresh Market was described as "rudderless" as its comparable-store sales suffered and its share price continued to fall markedly, reaching a low of $18.70 in late August 2015. With its share

11

price depressed, Fresh Market was ripe for the picking.

45. On September 1, 2015, Fresh Market announced that it had named Defendant Anicetti as the Company's President and CEO, and that Anicetti had also been named to the Board. At least a month prior to that announcement, Defendant R. Berry, without the Board's knowledge, approached Apollo about taking Fresh Market private. In the summer, R. Berry, without the Board's knowledge, had also reached out to several buyout firms, seeking a private equity partner.

46. Upon information and belief, in early July 2015, a representative of Apollo, Andrew Jhawar, spoke to R. Berry about an interaction involving Fresh Market, and on September 4, 2015, the same representative reiterated Apollo's interest in acquiring Fresh Market.

47. R. Berry indicated that the feeling was mutual, but, in order to feign ignorance about Apollo's plan and maintain deniability about his exclusive commitment to work with Apollo, R. Berry told the representative to contact his son B. Berry to negotiate an equity rollover transaction. As R. Berry was aware, Apollo followed his instructions and had several communications with B. Berry regarding potential transaction structures. On September 25, 2015, the Apollo representative told R. Berry and B. Berry that Apollo would be making an offer to the Company and asked whether they wanted to participate in the transaction.

48. The Board first learned of these conversations on or about October 1, 2015, when it received an unsolicited preliminary non-binding indication of interest from Apollo, on behalf of equity funds managed by it, proposing to acquire the Company in an all-cash transaction for a purchase price of $30.00 per share ($1.50 per share higher than the ultimate merger consideration). However, unbeknownst to the Board at the time, Apollo had previously discussed

12

this matter with Defendant R. Berry and his son B. Berry, who collectively owned approximately 9.8% of the outstanding common stock of the Company. The Apollo letter also indicated that R. and B. Berry would roll over their shares into the new company and would be working in an exclusive partnership in connection with a potential acquisition of the Company. R. Berry failed to advise the Board of his discussions with Apollo prior to the time it received Apollo's offer.

49.     Apollo's October 1, 2015 proposal stressed that if Apollo acquired the Company, "the newly appointed Chief Executive Officer of The Fresh Market will have increased time and more resources to drive many of these initiatives as a private company under Apollo's ownership." A supporting presentation enclosed with the proposal emphasized that Apollo's practice was to ensure that "[i]ncentives are aligned between Apollo and our management team partners – when Apollo makes money, the management team makes money." These early overtures to management were never disclosed to stockholders and ultimately motivated the Board to acquiesce to and conceal the Berry's scheme.

50.     On October 5, 2015, Scott Duggan, Fresh Market's Senior Vice President – General Counsel, contacted Defendant R. Berry to clarify his relationship with Apollo and his interactions with Apollo prior to Apollo's submission of its October 1, 2015 proposal. Defendant R. Berry, for the first time, informed Mr. Duggan that he had engaged in three separate conversations with a representative of Apollo regarding a potential transaction. The first conversation had taken place a few months prior to Apollo's letter when Andrew Jhawar, senior partner with Apollo, had contacted Defendant R. Berry to have a general discussion about Fresh Market and the food retail industry. The second conversation had taken place a few weeks prior to Apollo submitting its October 1, 2015 proposal and again involved discussions with Mr. Jhawar wherein Mr. Jhawar indicated to Defendant R. Berry that he was interested in the food

13

retail industry, and Fresh Market in particular, and had asked Defendant R. Berry if he would be interested in participating in a transaction through an equity rollover. The third conversation took place shortly before Apollo's letter, and was a courtesy call during which Defendant R. Berry was informed that Apollo would be sending the letter.

51.     At its October 15, 2015 meeting, the Board decided to create a committee ("Strategic Transaction Committee") that would be responsible for reviewing and evaluating communications from stockholders and other third parties and reviewing and evaluating, and making recommendations to the Board with respect to, Apollo's proposal and any other proposals from third parties.   The Board suggested that the Strategic Transaction Committee work with J.P. Morgan as financial advisor.   J.P. Morgan provided to the Board a document disclosing its relationships with Apollo, but it failed to disclose its relationships with the Berry family. The Board later learned that J.P. Morgan provides wealth management services to R. Berry. However, this was never disclosed to stockholders.

52.     Further, at the meeting, R. Berry represented to his fellow directors that he had spoken to Apollo but had not committed to a transaction, was not working exclusively with Apollo and was not involved in the formulation of Apollo's proposal. The Board never questioned these representations, which have since been contradicted, and, instead, intentionally, recklessly and/or negligently included these statements in the 14D-9.  Further, although R. Berry communicated to the Board that he had been in contact with at least one other private equity firm, Fresh Market omitted this fact, which would have revealed that, despite his representations to the contrary, R. Berry was actively involved in pursuing a private equity firm partner to acquire Fresh Market.

53.     At the October 15, 2015 Board meeting, R. Berry also represented that he was not

14

aware of any conversations that may or may not have occurred between Apollo and B. Berry, but neglected to mention that he had specifically directed Apollo to discuss transaction structures with B. Berry and that Apollo had telephoned him and B. Berry to advise them of Apollo's forthcoming proposal. These facts were also omitted from the 14D-9.

54.     Also omitted from the 14D-9, on October 15, 2015, when R. Berry told his fellow directors that he had been in contact with at least one other private equity firm, he stated that he "was not aware of any other potential private equity buyer . . . with whom he would be comfortable engaging in an equity rollover." Thus, notwithstanding Fresh Market's attempt to create the false impression of arms'-length distance between R. Berry and Apollo, unbeknownst to Fresh Market shareholders, R. Berry had already decided in the summer of 2015 that the only acquiror with whom he would participate was Apollo.

55.     After R. Berry left the meeting, the Board discussed the Apollo proposal and timing issues, including that Anicetti, the nascent CEO, was only in the position for about a month and was still developing a strategic plan and long-term forecast. The Board instructed management to finish their plan and forecasts and to advise Apollo that the Board would respond after the work was complete.  By this time, however, Apollo had communicated to Fresh Market management that "when Apollo makes money, the management team makes money," and Fresh Market management, therefore, was motivated to create forecasts that would enable Apollo to acquire the Company cheaply.

56.     Further, at the October 15 meeting, the Board also discussed: (i) the threats posed by activist stockholders, including by Neuberger Berman LLC ("Neuberger"), one of the Company's significant institutional shareholders, which had sent a letter to the Company on October 8, 2015 recommending that the Board pursue a sales process; (ii) that the Company had

received other communications from activist stockholders and private equity firms; and (iii) that Apollo might take action to increase the pressure on the Board, including by potentially making its proposal public, all of which the 14D-9 glosses over. Contrary to the misrepresentation in the 14D-9 that shareholder pressure was merely a *possibility*, the Board had already been receiving pressure and communications from stockholders, which provided undisclosed pressure on the Board to quickly sell Fresh Market and avoid a potential proxy fight.

57.     On October 15, 2015, Apollo sent a second letter to the Board reiterating its interest in buying Fresh Market and requested a response by October 20, 2015.

58.     Before the Strategic Transaction Committee could communicate a response to Apollo, information concerning a potential private equity buyout and R. Berry's connection with Apollo was leaked to the press. On October 16, 2015, *Reuters* reported that Apollo had agreed to work with R. Berry and his son-in-law, Michael Barry, on a potential offer to buy Fresh Market, and also noted that:

> Fresh Market Inc. (TFM.O) founder and board chairman Ray Berry is exploring a bid to take the U.S. specialty grocery retailer private with the help of a private equity firm, according to people familiar with the matter.
>
> Berry, who has a 4.1 percent stake in the company, has reached out to several buyout firms, seeking a private equity partner in order to put together an offer for Fresh Market, the people said this week.
>
> Private equity firm Apollo Global Management LLC (APO.N) has already agreed to work with Berry on the potential offer for Fresh Market, the people said.

59.     The Transaction was thus the product of a secret, manipulated sale process in which Defendant R. Berry was able to back channel with Apollo before the process even began, giving Apollo an unfair advantage and setting up a process by which it was impossible for other interested parties to catchup. The 14D-9 misrepresented and omitted the foregoing material facts and concealed and facilitated R. Berry's scheme.

16

60.     As a result of the R. Berry's undisclosed actions, Apollo was able to undermine the original plan for a second round of bidding, force the Company to speed up its timeframe to better accommodate its own interests, and ensure that other potentially interested parties had insufficient time to complete their due diligence on Fresh Market. Before the *Reuters* article was published, Apollo capitalized on the leak and utilized it to apply pressure to the Company's Board. On October 15, 2015, Apollo sent a letter to the Board stating:

> [It has] come to [Apollo's] direct attention that there are rumors in the marketplace and that the national news outlets are actively seeking information about a possible transaction. This reinforces our desire to engage in discussions as soon as possible in order for you to manage the process in a calm and deliberative manner.

**C.     The Reactionary Strategic Plan and Management Forecasts**

61.     Even though the Board had just hired a new President and CEO that was working on developing and implementing a new strategic plan, the *Reuters* announcement forced the Board's hand. On October 18, 2015, the Strategic Transaction Committee concluded that it needed to issue a press release announcing the commencement of a review of its strategic and financial alternatives. That press release was issued on October 20, 2015.

62.     Apollo and Defendant R. Berry's actions were calculated to catch the Company off guard during a transition period between CEO leadership, and when Fresh Market's new strategic plan was yet to be fully developed. Such timing was not coincidental, and is most likely the product of Defendant R. Berry attempting to maximize his own and his family's profits at the expense of Fresh Market's public stockholders.

63.     Moreover, the Strategic Transaction Committee's decision to issue the press release was prompted by a recommendation from its conflicted financial advisor, J.P. Morgan. J.P. Morgan was motivated by its contingent fee arrangement to push the Company toward a

sale. Consistent with that motive, J.P. Morgan emphasized to the Board that there were investor expectations surrounding a potential sale, *i.e.*, the press releases had caused investors to anticipate a sale, so any decision by the Strategic Transaction Committee and/or the Board ultimately not to pursue a sale could cause a drop in the Company's stock price and even greater pressure from stockholders, including activist stockholders.

64.     Also at the October 18, 2015 meeting, the Board decided to respond to Apollo's October 15, 2015 assertions by sending a letter stating that its proposal would be considered as part of the ongoing strategic review process and refuting certain points in their letter based on the statements R. Berry had made at the October 15, 2015 meeting.

65.     On October 20, 2015, following the issuance of the Company's press release, *Bloomberg* reported that R. Berry was considering taking Fresh Market private and had "turned to Apollo Global Management for help."

66.     On October 21, 2015, Apollo withdrew its October 1, 2015 proposal to acquire Fresh Market.

67.     At its October 18, 2015 meeting, the Board approved the hiring of McKinsey as a strategic consultant to assist management with development of the strategic plan. In late October and through November 2015, Anicetti and the management team worked with McKinsey to develop Fresh Market's strategic plan and forecast, and the Strategic Transaction Committee met with members of management and McKinsey, among others, to discuss that plan and forecast. Fresh Market's forecast took into account the risks inherent in management's plan and was discounted accordingly (nevertheless, as noted below, when J.P. Morgan performed its valuation analyses in connection with the Transaction, management instructed J.P. Morgan to apply additional risk adjustments to the forecasts and falsely characterized the forecasts as "an

optimistic scenario if every element of the plan went according to estimates from both an execution and timetable standpoint.").

68.     On November 25, 2015, Apollo reaffirmed its prior preliminary nonbinding indication of interest to acquire Fresh Market in an all-cash transaction for $30.00 per share. Apollo again stated that it was making the proposal together with the Berrys.

69.     After receiving the letter from Apollo, the Board's counsel contacted R. Berry's counsel to determine whether the letter was accurate.  On November 28, 2015, R. Berry's counsel responded that since Apollo withdrew its earlier offer in October, R. Berry had one conversation with Apollo, where he agreed, as he had done back in October, that he would roll over his equity interest.  None of this was disclosed previously to the Board or stockholders.  R. Berry also deceptively represented that he would consider rolling his equity interest to another company "provided he has confidence in its ability to properly oversee the company" (which is contradicted by the facts herein) and went on to explain that he believed that "Apollo [wa]s uniquely qualified to generate value because of its recent success in TFM's space with the acquisition of Sprouts" – *i.e.*, R. Berry did not have the requisite confidence in any other private-equity firm's "ability to properly oversee the company." Finally, and most egregiously, the communication threatened that, if the Company remained public, R. Berry would consider selling his significant Fresh Market holdings in the open market, which would have caused significant downward pressure on the Company's share price. The 14D-9 failed to disclose that: (i) R. Berry threatened to sell all of his shares if the Board did not sell the Company; (ii) R. Berry required that he have confidence in any non-Apollo bidder; and (iii)  R. Berry represented to the Board that he lacked such confidence in any other private equity firm.

70.     Moreover, in light of the Berrys' October agreement to group together with

19

Apollo to acquire the Company, pursuant to §13(d) of the Exchange Act, R. Berry, B. Berry and Apollo were required to file with the SEC a beneficial ownership report on Schedule 13D disclosing that they had formed a group with the intention of changing or influencing the control over the Company. They never did so.

71.     On December 1 and 2, 2015, the Board met. One of the issues discussed was the pressure that the Board had received to pursue a sales process. Of particular significance, the Board discussed the pressure being applied by R. Berry in some detail, including the fact that R. Berry had communicated, through counsel, that he "wanted the Corporation to pursue a sale." At the meeting, the Board considered and reviewed the November 28, 2015 e-mail described above. (Notably, the Board was subject to other pressures to sell the Company, including from Neuberger Berman, the stockholder that had previously sent a letter urging a sales process and that had more recently spoken with Defendant Noll and the Company's general counsel to again press the Board to sell the Company. This communication was also not disclosed to stockholders.)

72.     Over the course of a two-day meeting, Fresh Market's directors (except R. Berry) received presentations from management and McKinsey on the Company's new strategic plan and engaged in discussions about the plan and management's financial projections based on that plan. As noted above, management was motivated to understate Fresh Market's prospects in order to obtain lucrative equity-based compensation packages from a private equity firm in a sale of Fresh Market.  Reflecting that motive, management applied a 15% overall risk adjustment to the projections, with different initiatives receiving different risk weighting based on likelihood of achievability.

73.     The Board purportedly determined that the strategic plan and projections were

comprehensive, but expressed concern about the long-term nature of the plan and whether investors would give the Company the time to implement the plan. The Board was purportedly concerned that pursuing the long-term standalone strategic plan would lead to stockholder activists seeking to oust directors.

74.     At this meeting, the Board also received a presentation from J.P. Morgan, including a preliminary financial analysis of Fresh Market based on management's manipulated projections. J.P. Morgan's illustrative discounted cash flow analysis based on the management projections provided a range of values from $34.50 to $44.00 per share. Even after adjusting the (already risk-adjusted) projections for a 1% decrease in revenue growth, the projections still implied a range of $31.00 to $39.25 per share, and, after separately adjusting for a 1% decrease in earnings before interest, taxes, depreciation, and amortization ("EBITDA") margin, implied a range of $29.00 to $37.00 per share. J.P. Morgan's illustrative leveraged buyout analysis, also based on the projections, indicated a value range from $29.00 to $39.25 per share. J.P. Morgan further indicated that it could potentially result in a higher price if there were synergies that could drive more value.  J.P. Morgan also presented a present value of future share price analysis (based on multiples that did not account for the Company's projected long-term growth) that was pessimistic, indicating values of $23.75 to $38.75 per share, making a potential sale seem significantly more attractive.

75.     Following J.P. Morgan's presentation, the Board decided to mimick a sales process for Fresh Market. On December 2, 2015, the second day of its two-day meeting, the Board passed resolutions allowing the Strategic Transaction Committee to formulate and direct a sales process, negotiate a transaction and make recommendations to the Board. The full Board retained authority to make a final decision on any potential transaction.

76.     At no time during this process did the Board ever demand that R. Berry stop communicating with Apollo or any other potential acquiror about a potential rollover of his equity.

77.     On December 3, 2015, the Strategic Transaction Committee's counsel contacted R. Berry's counsel to discuss: (i) R. Berry's willingness to engage in an equity rollover with other potentially interested parties (even though he already stated that he lacked confidence in any bidder other than Apollo); (ii) whether R. Berry would agree not to engage in any discussions with interested parties regarding an equity rollover until authorized to do so (even though he had already agreed with Apollo); (iii) whether J.P. Morgan could confirm to all potentially interested parties that R. Berry was not working exclusively with Apollo and that he would be available to discuss an equity rollover with any winning bidder; and (iv) that no participants would be permitted to speak with R. Berry until authorized by the Company. R. Berry purportedly agreed to abide by this process.

78.     On December 9, 2015, Apollo and Fresh Market entered into an agreement that prohibited Apollo from having any discussions with potential co-bidders or sources of equity financing without prior authorization by the Company. Despite purportedly agreeing to this restriction, as acknowledged in its Schedule TO, filed on March 25, 2016, Apollo continued to have prohibited discussions with the Berrys, but attempted to downplay them.

79.     Additionally, during the same time, R. Berry continued to pressure Board members regarding a transaction with Apollo. At a December 22, 2015 Strategic Transaction Committee meeting, Defendant Anicetti reported that R. Berry criticized the Board for not immediately beginning discussions with Apollo and for the length of time the Board's proposed process would take. These facts were also omitted from the 14D-9.

22

80.     On January 12, 2016, J.P. Morgan made a process letter, establishing January 25, 2016 as the deadline to submit indications of interest, available to all potential counterparties who had executed confidentiality agreements. The process letter falsely conveyed that R. Berry would be open to discussing a potential rollover of his shares.

81.     At a January 21, 2016 meeting of the Strategic Transaction Committee, it was reported that R. Berry expressly (but falsely) confirmed that he had not spoken to any potential participant or anyone at Fresh Market about the sales process. At that meeting, Defendant Anicetti also reported that a component of Fresh Market's new strategic plan was already beginning to have a positive impact on sales.

82.     On the January 25, 2016 deadline, Apollo submitted a preliminary non-binding indication of interest proposing to acquire Fresh Market in an all-cash transaction at a price of $31.25 per share.

83.     At this stage of the process, based on the reports that R. Berry had agreed to work with Apollo, other potential acquirors were undoubtedly aware that Apollo was the front runner and that they could not feasibly acquire Fresh Market without R. Berry's support.  Thus, the Strategic Transaction Committee's decision to prevent interested parties from speaking to R. Berry served to further manipulate the sales process to the advantage of Apollo.

84.     On February 2, 2016, the Board (except R. Berry) met and discussed the sales process. In connection with that meeting, J.P. Morgan discussed with the Board the fact that "the leveraged finance markets were in an extremely challenging state, with volatility, difficult pricing and lack of receptivity in the market to new issuances other than from the most highly rated credits." In light of the Berrys' commitment to roll their equity into a transaction with Apollo, this development meant that securing debt financing would present a more significant

challenge to the other potential counterparties, which they needed to resolve before making their best proposals to acquire Fresh Market.

85.     Nevertheless, on February 18, 2016, the Strategic Transaction Committee determined that rollover discussions should be permitted *only after* final bids had been received, after the Board had determined that it would proceed with a potential sales transaction and after the Board had agreed on price and other material transaction terms with the winning bidder.

86.     Apollo's knowledge that the Berrys were committed to rolling their equity into a transaction with them made any concerns about obtaining debt financing significantly less important to Apollo than to the other parties. Thus, the prohibition of rollover discussions prior to being crowned the winning bidder further secured Apollo's advantage. While Apollo knew it would need to borrow enough money only to pay for about 90% of the equity, other potential acquirors had to assume they would need financing to pay for all 100%.

87.     Over the next weeks, the Strategic Transaction Committee communicated to the potential bidders that offers should be submitted by March 14, 2016.   Apollo, however, continued to press for a faster process. The Strategic Transaction Committee obliged, engaging with Apollo on the terms of a proposed merger agreement long before any other party was given that option and allowing it to submit a bid earlier than March 14, 2016.

88.     On March 8, 2016, Apollo submitted its offer.   It lowered the price it was offering, submitting a definitive proposal to acquire Fresh Market in an all-cash transaction for the price of $27.25 per share (down from its January 25, 2016 offer of $31.25 per share) of Fresh Market common stock. The proposal stated that it was not contingent on an equity rollover, but this non-contingency was illusory given that the Berrys had already agreed to rollover their equity.   Thus, Apollo was fostering the misperception that all potential acquirors were on a level

playing field by pretending there was no such preexisting agreement with the Berrys.

89.     On the same day, March 8, 2016, the Strategic Transaction Committee determined that a price of $27.25 was not sufficient and Apollo could only engage in (further) discussions with R. Berry and other members of the Berry family regarding a potential equity rollover if Apollo improved its offer.

90.     On March 9, 2016, before the formal bid deadline, Apollo submitted its "best and final" offer to acquire Fresh Market in an all-cash transaction for $28.50 per share. Apollo reiterated its interest later that day when it spoke with the Berry family regarding the equity rollover.

91.     Later that morning, the Strategic Transaction Committee determined that Apollo would be allowed to engage in discussions with the Berry family, to be overseen by J.P. Morgan. That evening, conversations that were anything but "introductory," as misleadingly characterized in 14D-9, occurred between the parties.

92.     The Strategic Transaction Committee met on March 10, 2016 to discuss Apollo's "best and final" offer. Recognizing that the $28.50 per share offer was significantly lower than Apollo's initial indication of interest and lower than the valuation ranges implied by J.P. Morgan's December 2015 valuation analyses based on management's strategic plan and projections, and recalling Apollo's promise that "when Apollo makes money, the management team makes money," Anicetti and Ackerman argued for downward departures from management's plan and projections, falsely stating that the projections were "an optimistic scenario if every element of the plan went according to estimates from both an execution and timetable standpoint," when in fact, they had reported at the time the projections were developed, that they incorporated a "15% overall risk adjustment, with different initiatives receiving

different risk weighting based on likelihood of achievability."

93.     Based on this false depiction of the projections as blithely assuming all would go well and the fact that, while comparable store sales so far had been in line with the plan, new store sales had underperformed slightly relative to the plan, Anicetti and Ackerman convinced the Strategic Transaction Committee that those projections were in fact an "optimistic" case that required further downward adjustments.

94.     Following the meeting, J.P. Morgan presented its valuation analyses based on the November 17 Management Case, as well as on three increasingly dire downside scenarios, which contemplated: (a) that the Company's sales would underperform significantly; (b) that margins would be significantly worse than anticipated; and (c) that both sales and margins would be significantly worse than anticipated (even though a primary philosophy reflected in the strategic plan was to sacrifice some margin in order to boost sales through reduced prices). In addition to using lowered projections that incorporated multiple risk adjustments, J.P. Morgan made significant changes to its analyses, including by increasing the equity risk premium and employing a less favorable discount rate.

95.     Nevertheless, based on the original management projections, even using the new, less-favorable discount rate, J.P. Morgan's discounted cash flow analysis still implied a value of $33.75 to $42.25 per share, well above the deal price.

96.     Later on March 10, 2016, the Board's counsel received a draft of a rollover, contribution and exchange agreement and a draft support agreement from Apollo's counsel.

97.     At a meeting held on March 11, 2016, the Board determined to recommend the sale of Fresh Market to Apollo to Fresh Market's public shareholders for the dramatically lowered price of $28.50 per Fresh Market share (down almost 9% from Apollo's January 25,

2016 offer of $31.25 per share). Although that price was well below the range of values indicated by J.P. Morgan's discounted cash flow analysis, based on the management forecasts, even using J.P. Morgan's new, higher discount rate, J.P. Morgan rationalized the lower price by relying on the three sets of twice and thrice risk adjusted scenarios for its analysis.

98.    Also at the March 11, 2016 meeting, the Board granted Apollo permission to engage in negotiations with R. Berry and B. Berry regarding the rollover of their existing shares. Predictably, the negotiations were brief and Apollo and the Berrys entered into a rollover, contribution and exchange agreement and a support agreement on the next day, March 12, 2016, before the acquisition had even been announced.

99.    Throughout the process, unbeknownst to Fresh Market's public shareholders, Fresh Market and the Director Defendants favored the interests of Apollo, the Berrys, the Board, and Company management over the interests of Fresh Market's public stockholders.  The Board: (a) failed, for over two months, to force R. Berry to stop talking with Apollo about taking the Company private and rolling over his equity; (b) failed to address R. Berry's disloyalty in secretly trying to take the Company private; (c) allowed R. Berry's disloyal efforts to rollover his and his son's equity; (d) accepted Apollo's unfair and inadequate offer of $28.50 per share at a time the effect of Apollo's equity rollover advantage over other bidders, emboldening it to lower its offer; (e) while knowing of J.P. Morgan's conflicts, accepted J.P. Morgan's fairness analyses in approving the deal; and (f) then issued the false and misleading 14D-9 to conceal the foregoing and facilitate the Transaction.

100.    Thus, the 14D-9 was also false in misleading in its recommendation to Fresh Market shareholders. In the 14D-9, Fresh Market and the Director Defendants represented, *inter alia*, that they: (i) determined that the Transaction is fair to and in the best interests of Fresh

Market and its public stockholders; and (ii) declared the Merger Agreement and the Transaction advisable; and (iii) recommended that Fresh Market's stockholders tender their shares in the Tender Offer. However, as a result of, *inter alia*, the undisclosed manipulation of the sales process and Fresh Market's forecasts; the unfair advantages afforded to Apollo; and the Berrys' backroom dealings with Apollo and *de facto* refusal to engage with an alternative bidder, the Board's purported determination that the Transaction was "fair" and "advisable," and its recommendation that Fresh Market shareholders tender their shares in the Tender Offer were false and misleading.

## D.    The Transaction

101.    On March 14, 2016, Fresh Market and Apollo issued a press release announcing the Transaction:

> The Fresh Market, Inc. (NASDAQ: TFM) ("The Fresh Market" or the "Company"), a growing specialty grocery retailer, and an affiliate of Apollo Global Management, LLC (NYSE:APO) (together with its consolidated subsidiaries, "Apollo") today announced that they have entered into a definitive agreement (the "Merger Agreement") whereby certain funds managed by Apollo, a leading global alternative investment manager, will acquire The Fresh Market for approximately $1.36 billion.

> The $28.50 per share all-cash offer by the Apollo Funds represents a premium of approximately 24% over The Fresh Market's closing share price on March 11, 2016, and a premium of approximately 53% over the February 10, 2016 closing share price, the day prior to press speculation regarding a potential transaction.

> The announcement follows an open and thorough review of strategic alternatives undertaken by The Fresh Market Board of Directors to maximize stockholder value. The transaction will be implemented through a cash tender offer at $28.50 per share. The transaction was unanimously approved by the Board of Directors of The Fresh Market, other than Ray Berry, Chairman and Founder of The Fresh Market, who recused himself from all Board discussions related to the review and from the Board vote approving the transaction. Ray Berry and Brett Berry, who collectively own approximately 9.8% of The Fresh Market's outstanding shares, have agreed not to tender shares held by them into the tender offer and will both participate and rollover the vast majority of their holdings in the transaction with Apollo. In addition, George Golleher, with whom Apollo has had a long-term

operating partner consulting relationship and who was formerly Chief Executive Officer of Smart & Final and Ralphs Grocery Company/Food-4-Less during ownership by other Apollo affiliated funds, will be a co-investor with the Apollo funds in the transaction.

"We are pleased to have reached this agreement with Apollo, which follows a comprehensive review of strategic and financial alternatives that generated interest from numerous parties. After an open and thorough process, our Board concluded that this offer maximizes value for our stockholders," said Rich Noll, The Fresh Market's Lead Independent Director.

"We are excited about this transaction with Apollo, which recognizes the value of The Fresh Market's strong brand and significant growth prospects while providing stockholders with an immediate and substantial premium," said Rick Anicetti, The Fresh Market's President and Chief Executive Officer. "Apollo is a highly-regarded investor, bringing deep industry expertise and financial resources, and we look forward to working with them to build on our progress in achieving our strategic plan to deliver long-term profitable growth."

"We are delighted about this transaction with The Fresh Market, which was one of the early pioneers in small-box grocery, offering unique, delicious and healthy food with a keen focus on perishables," said Andrew S. Jhawar, Senior Partner and Head of the Retail and Consumer Group at Apollo. "We believe there is a significant opportunity to enhance the brand, merchandise offering and price-value combination to make The Fresh Market a primary destination for food shoppers, while at the same time being committed to social responsibility through partnerships with local vendors and communities. Our team at Apollo has had the tremendous fortune of having executed transactions in several consumables retailers and brands – such as Sprouts Farmers Market, Smart & Final, Hostess Brands and General Nutrition Centers, among others – that have undergone significant transformations under our strategic guidance and we intend to bring that experience to bear at The Fresh Market. We look forward to partnering with Ray Berry, Brett Berry and George Golleher, and beginning our discussions with the executive management team and the over 13,000 team members at The Fresh Market so that we can assist the company in delivering the most inspiring and engaging food shopping experience in the industry with best-in-class customer service.

The transaction – which is expected to close in the second quarter of 2016 – is conditioned upon satisfaction of the minimum tender condition which requires that shares representing more than 50 percent of the Company's common shares (other than shares held by Ray and Brett Berry that are being rolled over) be tendered, the receipt of approval under the Hart-Scott-Rodino (HSR) Antitrust Improvements Act of 1976 and other customary closing conditions.

Under the terms of the Merger Agreement, the Company may actively solicit

alternative acquisition proposals during a 21-day period following the execution date of the definitive agreement, continuing until midnight on April 1, 2016. There can be no assurances that this process will result in a superior proposal, and The Fresh Market does not intend to discuss any developments with regard to this process unless and until the Company's Board of Directors makes a decision with respect to any potential superior proposal.

The transaction has fully committed financing in place. It will be financed primarily through the incurrence of $800 million in new senior secured notes and an equity contribution of approximately $525 million from funds managed by Apollo in addition to the equity rollover from the Berrys. The Fresh Market will also enter into a new $100 million revolving credit facility concurrently with the closing of the merger.

J.P. Morgan Securities LLC is serving as the exclusive financial advisor to The Fresh Market, and Cravath, Swaine & Moore LLP and Richards, Layton & Finger, P.A. are serving as its legal advisors. Barclays, RBC Capital Markets, LLC, Jefferies and Macquarie Capital are serving as financial advisors to Apollo. The debt financing is being committed to by Barclays, Royal Bank of Canada, Jefferies Finance and Macquarie, and Davis Polk & Wardwell LLP is serving as their legal counsel. Morgan, Lewis & Bockius LLP and Morris, Nichols, Arsht & Tunnell LLP are acting as legal advisors to Apollo and Paul, Weiss, Rifkind, Wharton & Garrison LLP is acting as legal advisor to Apollo as it relates to the debt financing.

102.    On the same day, *Bloomberg* published an article about how, in acquiring Fresh Market, Apollo had outmaneuvered The Kroger Company, a strategic buyer that would enjoy synergies from such a transaction that Apollo would not. The article, entitled "Apollo's Edge in the Fresh Market Auction," stated:

Strategic buyers like ***Kroger can justify paying more because they're better able to extract cost savings***, so it's ***unusual for them to be outmaneuvered*** by buyout shops. In this case, the ***latter had an edge***.

\*        \*        \*

***Bloomberg*** *News* reported in October that Fresh Market's founder and board chairman ***Ray Berry was considering taking the company private and had turned to Apollo for help***. While a deal with Kroger could have included Kroger's own shares as a form of payment, Fresh Market would account for less than 4 percent of the larger company's earnings. That means even if the acquisition paid off, there's a chance it might not have done much for Kroger's stock price.

*Berry and his son own roughly 9.8 percent of Fresh Market and likely had a preference for a deal that would let them maintain an equity stake in order to directly benefit if the company flourished under a new owner's control*. The chance to invest alongside Apollo, which made more than 10 times its investment in Sprouts Farmers Markets and 2.8 times its investment in Smart & Final, surely would have appealed.

*For Apollo, the Berry family's interest in rolling its stake (valued at about $133 million) helped plug a financing gap* at a time that has been tricky for buyouts, and resulted in a transaction involving less debt. That may have made banks more willing to commit, since less leverage is a feature favored by the eventual holders of the notes backing the buyout.

E.      **The Unfair Price**

103.     Pursuant to the Merger Agreement, Fresh Market stockholders received $28.50 in cash per share.  Notably, Fresh Market shares traded at levels about the per share consideration offered by the Transaction as recently as August 18, 2015. The price represents inadequate consideration, especially given the fifty-two week trading high of Fresh Market common stock $42.07 per share prior to the Transaction announcement. Moreover, at least one Wall Street analyst set a target price of $31 per share for Fresh Market common stock.  Further, Fresh Market stock was trading at as high as $41.12 per share in January 2015.

104.     Prior to the Transaction, the Company had exhibited strong operational execution and financial performance across the businesses in which it operated. For example, on November 19, 2015, Fresh Market released its Q3 2015 financial results. Notably, the Company saw a sales increase of 3.3% year-on-year for a total sales figure of $433.1 million. Furthermore, gross profit increased 4.3% or $5.9 million year-on-year, with a related increase in the Company's gross margin rate of 30 basis points to 33.2%. Additionally, the Company opened six new stores in this period, including stores in Florida, South Carolina, Georgia, Alabama and Connecticut, increasing the Company footprint as of October 25, 2015 to 180 stores in 27 states.

105.     Remarking on these results, Defendant Anicetti, the Company's recently hired

CEO, noted that the future prospects of the Company looked positive, saying, "The Fresh Market is a unique brand with enormous untapped potential."

106.    Fresh Market's strong recent performance was not an anomaly, but rather part of a trend of upward financial mobility. On August 20, 2015, the Company released its Q2 2015 financial results which showcased a net sales increase of 4.7% year-on-year. Additionally, the Company's gross profits increased 3.7% year-on-year and the Company's gross margin rate increased 30 basis points from the same quarter in 2014. Also of note was that the Company opened six new stores with locations in Texas, North Carolina, Georgia, Louisiana and New York, bringing the Company's total footprint to 174 stores in 27 states. Speaking positively on these results, Interim CEO Sean Crane ("Crane") stated that the Company's financial health was "sound."

107.    Looking further back, Fresh Market reported a net sales increase of 7.2% in the first quarter of 2015, as stated in the Company's May 21, 2015 press release announcing 2015 Q1 financials. Additional positive results from the period included a gross profit increase of 8.4% or $12.4 million compared to Q4 of 2014 and a 40 basis point jump in gross margin year-on-year. Additionally, the Company exhibited further growth in this period, opening two new stores in Missouri.

108.    Indeed, the Company had long-term revenue growth that greatly exceeded the industry average. According to *Morningstar.com*, as of March 15, 2016, Fresh Market had three-year average revenue growth of 16.5% compared to an industry average of 3.2%.

109.    Despite the consistent increase in net income, gross profits, and gross margins throughout fiscal 2015, and Fresh Market's forecasted long-term revenue growth that greatly exceeds its industry average, the Transaction, effectuated by the false and misleading 14D-9 that

concealed the manipulation of the sales process and valuation of Fresh Market, deprived Plaintiffs and other public stockholders of Fresh Market from receiving consideration reflective of the true value of the Company.

110.    Moreover, Apollo ultimately lowered its offer for the Company in the Transaction. As noted above, on October 1, 2015, Apollo proposed to acquire Fresh Market in an all-cash transaction for a purchase price of $30.00 per share. Later, Apollo submitted a preliminary non-binding indication of interest proposing to acquire Fresh Market at price of $31.25 per share. Furthermore, in their indications of interest, three of the four other potential acquirers included price ranges with upper bounds in excess of the consideration offered by Apollo the Transaction.

111.    The primary reason that Apollo gave for lowering its offer by almost 9% on March 8, 2016 was that Apollo purportedly found less financing available, and at a higher price than it had anticipated, and therefore could not afford to pay Fresh Market stockholders what it had previously offered. Rather than rejecting $28.50 as inadequate, the Board accepted that meager price to sell Fresh Market, and allowed its Chairman and his family to uniquely benefit from the Transaction by rolling over their shares, all at the expense of Fresh Market's public stockholders. Fresh Market opted to pursue the Transaction with Apollo and, through false and misleading statements and manipulative conduct, effectuated same.

112.    Indeed, the consideration offered by the Transaction was even at the low end of or below the ranges set forth in the *Selected Transactions Analysis* prepared by J.P. Morgan. Further, the *Selected Transactions Analysis* analyzes only five transactions. Thus, the inclusion or exclusion of just one marginal transaction could have skewed the implied valuation range for Fresh Market in that analysis such that the Transaction consideration would otherwise have

fallen below the lower bound of both implied valuation ranges instead of just one of them.

113.    Furthermore, in its *Public Trading Multiples Analysis*, J.P. Morgan used a very small sample size in light of all the comparable companies available. And, J.P. Morgan apparently did no benchmarking to adjust the few sampled companies to the higher gross margins and the higher EBITDA margins. This failure resulted in J.P. Morgan applying inappropriately low multiples to Fresh Market in its *Public Trading Multiples Analysis*, and consequently deriving an artificially depressed valuation range for Fresh Market. Had J.P. Morgan properly benchmarked the comparable companies, the valuation range would have been in the $30s per share. The other flaw in J.P. Morgan's *Public Trading Multiples Analysis* is that it included, when it should not have, Fresh Market's EBITDA and price to earnings ("P/E") multiples, resulting in J.P. Morgan employing an EBITDA multiple reference range of 4.5x-8.0x for 2016E (estimated), and a P/E multiple reference range of reference range of 12.0x-20.0x for 2016E. J.P. Morgan should have used an EBITDA multiple reference range of 7.2x-13.3x for 2016E and a P/E multiple reference range of 16.4x-28.7 for 2016E. This means that, had J.P. Morgan conducted its *Public Trading Multiples Analysis* correctly, the high end of the values it observed would have actually been at the low end of the value range derived from this analysis.

114.    J.P. Morgan again used an inordinately small number of transactions—just five— in its *Selected Transaction Analysis*. J.P. Morgan went back ten years to select transactions and in that period there were perhaps ten times as many comparable transactions. Oddly, J.P. Morgan selected two transactions from 2006, and then skipped all the way to 2013 for the other three transactions it selected. And among the five transactions J.P. Morgan selected was Kroger's November 2015 acquisition of Roundy's Supermarkets, Inc. ("Roundy's"), in which transaction J.P. Morgan served as Roundy's financial advisor. Notably, in the Roundy's

Solicitation/Recommendation Statement on Schedule 14D-9 for the Kroger deal, J.P. Morgan *selected twenty-four transactions* for its *Selected Transactions Analysis* of Roundy's.

115.    From its *Selected Transaction Analysis* here, J.P. Morgan derived per share value ranges of $28.75 to $36.50 based on Firm Value/2015 Projected EBITDA, and per share values ranges of $27.00 to $34.25 based on Firm Value/2016 Estimated EBITDA. Clearly this analysis supports a much higher per share price than the $28.50 per share offer price. But J.P. Morgan failed to disclose the multiples for each of these transactions, and so it is unclear how it selected 7x-9x trailing EBITDA to apply to Fresh Market's 2015 Projected and 2016 Estimated EBITDA. If the range of transaction multiples is 9x to 11x, and the average is 10x, then the implied share equity ranges would have been much higher than J.P. Morgan derived.

116.    In its *Discounted Cash Flow Analysis*, J.P. Morgan conducted four illustrative discounted cash flow analyses using four sets of projections provided by Fresh Market's management, from which J.P. Morgan derived the following per share value ranges:

| | November 17 Management Case | Comparable Growth Scenario | Gross Margin Scenario | Comparable Growth Scenario and Gross Margin Scenario |
|---|---|---|---|---|
| High | $   42.25 | $   32.75 | $   32.00 | $   26.00 |
| Low | $   33.75 | $   26.25 | $   25.50 | $   21.00 |

117.    First, the November 17 Management Case (developed by Fresh Market's management as part of the development of management's strategic plan and in connection with Fresh Market's review of strategic and financial alternatives) results in a value range well above the Transaction's price. Both the Comparable Growth Scenario (an alternate version of the November 17 Management Case to sensitize the November 17 Management Case *for the possibility of lower revenue growth* over the projection period) and the Gross Margin Scenario (an alternate version of the November 17 Management Case to sensitize for **the possibility of**

*lower gross margins* over the projection period) also results in per share value ranges with the Transaction's price at the bottom of these ranges. Finally, and inexplicably, the Comparable Growth and Gross Margin Scenario, combines the two scenarios to sensitize the November 17 Management Case *for the possibility of both lower revenue growth and lower gross margins* over the projection period.

118.    Second, the cash flow conversion rate inexplicably drops from the Management Case (which stabilizes at 43% in the last five years of the projection) to 40% in the Comparable Growth and Gross Margin Scenarios. In the last two years of the projections, the cash flow conversion rate falls to 36% without explanation. Assumptions are being made (which are not disclosed in the limited information in the 14D-9) that are causing the cash flow conversion rate to be depressed, which results in the artificially low value ranges derived in the Comparable Growth, Gross Margin, and Comparable Growth and Gross Margin Scenarios.

119.    Third, the 9%-10% discount rate that J.P. Morgan employed in its *Discounted Cash Flow Analysis* is significantly lower than 6%-8% discount rates of the comparable companies that J.P. Morgan selected for its *Public Trading Multiples Analysis*. Had J.P. Morgan used a 6%-8% discount rate, the unlevered free cash flows and the present value of those cash flows would have been higher, increasing the per share equity values derived from the *Discounted Cash Flow Analysis*.

120.    Fourth, in a discounted cash flow analysis, terminal values can represent up to 90% of an entity's total value. Here, J.P. Morgan used an implied EBITDA multiple in the final year of the analysis of just 5x. Because J.P. Morgan used a much higher EBITDA range of 7-9x in its *Selected Transaction Analysis*, the terminal value J.P. Morgan applied in its *Discounted Cash Flow Analysis* is artificially low, suggesting that the projected cash conversion rate is too

low or discount rate is too high. The improper application of implied EBITDA multiple in the final year of the analysis of just 5x results in depressed equity value range derived from the *Discounted Cash Flow Analysis*.

121.   As explained, J.P. Morgan's original discounted cash flow analysis based on management's November 17, 2015 projections valued the Company at between $34.50 and $44.00 per share. That is, J.P. Morgan's own analysis shows that the Company was worth between 21% and 54% more than the Transaction price.

122.   Even J.P. Morgan's final analysis in March, which used a discount rate that it had inappropriately increased, valued the Company at $33.75 to $42.25 per share.

123.   Moreover, as explained above, and unbeknownst to the Company's public stockholders, the November 17 Management Case already reflected any risks inherent in the Company's strategic plan as it incorporated a 15% risk adjustment. Accordingly, the analysis based on that forecast was already sufficiently conservative to provide a reliable indication of the Company's value – if not unduly conservative, given management's personal incentives to err on the side of pessimism.

124.   A proper valuation of the Company actually required upward adjustment from J.P. Morgan's $34.50-$44.00 per share discounted cash flow valuation range to correct the flaws in J.P. Morgan's analysis.

125.   The Transaction consideration was unfair because, among other things, as concealed by the manipulated forecasts, the intrinsic value of the Company's common shares was materially in excess of the amount offered in the Transaction.

126.   As these indicators make clear, if properly exposed to the market for corporate control and absent Defendants' manipulation of Fresh Market's forecasts and the sales process

(which were concealed by the false and misleading statements in the 14D-9), Fresh Market shareholders should have received a price materially in excess of the amount offered in the Transaction.

## F.    Insider Benefits

127.    The Transaction is the product of a hopelessly flawed process that was designed to ensure the sale of Fresh Market to Apollo on terms preferential to Defendants and other Fresh Market insiders and to subvert the interests of Plaintiffs and the other public stockholders of the Company. The Transaction was driven by R. and B. Berry, whom the Board allowed to enter into Rollover and Support Agreements with Apollo, and who will continue to enjoy the benefit of ownership of Fresh Market as it flourishes under Apollo. On the other hand, Fresh Market's public stockholders were induced to relinquish their Fresh Market holdings for an inadequate and unfair price of just $28.50 in cash per share, based on false and misleading statements, material omissions and manipulative conduct by Defendants.

128.    As a result of the Transaction, Company insiders reaped benefits not shared by other stockholders. Company Chairman and founder R. Berry and B. Berry, who collectively owned approximately 9.8% of Fresh Market's outstanding shares, both participated and rolled over the vast majority of their holdings in the transaction with Apollo.

129.    Unlike other Fresh Market stockholders, who were deprived of the ability to share in the future growth and financial success of the Company, R. Berry and B. Berry continue to participate in the Company's upside even after the Transaction. This is particularly troubling in light of the fact that Fresh Market's stock price had declined prior to the Transaction, so stockholders other than R. and B. Berry will not benefit from reversion of the share price that will occur after the Transaction.

38

130.    As a result of the Transaction, the Board and Fresh Market management received over $31 million from the sale of their illiquid holdings and from special payments—not being made to ordinary stockholders, and to which they would not otherwise be entitled—for currently unvested stock options, performance units, and restricted shares, all of which became fully vested and exercisable, and for the Company's senior management, change-of-control payments. For example, Defendant Anicetti received over $9 million for less than eight months of service, in addition to having presumably been granted an equity stake in the post-merger company promptly

131.    Likewise, the Company's CFO, Ackerman, received nearly $2 million for his accelerated options and equity awards and over $3.6 million in change-of-control benefits (nearly $2 million of which were "single-trigger" payments), as well as presumably receiving an equity stake in the post-merger company. Those payments dwarfed his less than $100,000 worth of common stock. Thus, Ackerman had a strong motive to lowball the financial projections used to justify the Transaction.

**G.    The Conflicts of Fresh Market's Financial Adviser**

132.    In negotiating the Transaction, Fresh Market was advised by a conflicted adviser. During the two-year period before January 31, 2016, the aggregate fees received by J.P. Morgan from Apollo were $116,780,392 (compared to fees received from Fresh Market during the same period of $204,372).

133.    In addition, according to Bloomberg, at or about the time the Transaction was announced, J.P. Morgan and its affiliates owned approximately one million shares of Apollo, worth approximately $17.6 million. Significantly, and undisclosed in the 14D-9, between October, 2015, when J.P. Morgan began assisting Fresh Market with the Transaction, and March,

2016, when the Transaction was announced, J.P. Morgan and its affiliates increased their position in Apollo by over 10% (from about 900,000 shares to 1.03 million).

134. Similarly, according to Bloomberg and undisclosed in the 14D-9, during the months that J.P. Morgan was advising Fresh Market on the Transaction (between December, 2015, and March, 2016), J.P. Morgan increased its holdings in Fresh Market common stock by *over 20x*, from about 30,000 shares to over 600,000 shares. J.P. Morgan's significant investment in Fresh Market strongly motivated J.P. Morgan to support the Transaction in order to realize substantial short term gains in its investment, and deterred J.P. Morgan from honestly and fairly valuing Fresh Market on a stand-alone basis, which would have precluded the quick gains expected from an imminent sale of the Company and required a longer-term investment in Fresh Market. J.P. Morgan's substantial undisclosed investments in Fresh Market thus provided it with interests that were contrary to those of Fresh Market's public shareholders.

135. Compounding the foregoing, the Board agreed to pay J.P. Morgan a fee of approximately $15 million, $2 million of which was payable upon the delivery by J.P. Morgan of its opinion and the remainder of which was contingent upon the consummation of the Transaction. Beyond that, and undisclosed to stockholders, J.P. Morgan also provides significant wealth management services to R. Berry.

## H. The Preclusive Deal Protection Devices

136. Moreover, the Board engaged in manipulative conduct by including terms in the Merger Agreement that ensured that a transaction with Apollo would be consummated on terms preferential to Apollo. Although such provisions are customary in corporate mergers, here, in light of, *inter alia*, the misrepresentations concerning the relationship between the Berrys and Apollo; R. Berry's willingness to engage with an alternative bidder; and the true/fair value for

Fresh Market, these provisions served as an artifice to conceal the manipulation of the sale process in favor of the Berrys and Apollo.

137.    While the Transaction Agreement did ostensibly permit Fresh Market to shop itself until April 1, 2015, the 21-day "go-shop" period provision was illusory and meaningless in light of the relationship between the Berrys and Apollo, the Company's artificially depressed projections/valuation and the deal protection devices in the Merger Agreement. Not surprisingly, no alternate bidders stepped forward during the short 21-day period.

138.    The Merger Agreement contained a "no-shop" provision. Pursuant to Section 5.02(b) of the Merger Agreement, Fresh Market and its subsidiaries had to immediately cease and cause to be terminated any existing discussions or negotiations with any person or its representatives with respect to any acquisition proposal. Section 5.02(b) provided that:

> Except as expressly permitted by this Section 5.02 and except in respect of any Person that has submitted a Takeover Proposal prior to the expiration of the Go-Shop Period with respect to which the Board of Directors of the Company or any committee or subcommittee thereof has made the determination referred to in Section 5.02(c)(ii) prior to the expiration of the Go-Shop Period and reaffirmed such determination during the period between the business day prior to the expiration of the Go-Shop Period and the expiration of the Go-Shop Period, the Company shall and shall cause each of its Subsidiaries to, and shall instruct and use its commercially reasonable efforts to cause its and their respective Representatives to, (i)  immediately cease any solicitation, discussions or negotiations with any Persons that may then be ongoing with respect to a Takeover Proposal and request that such Persons deliver to the Company or destroy all copies of, studies based upon and any extracts or summaries from, any non-public information of the Company in such Person's possession or control, which non-public information was provided by or on behalf of the Company in connection with a Takeover Proposal on or prior to the expiration of the Go-Shop Period, and (ii) until the Effective Time or, if earlier, the termination of this Agreement in accordance with Article VII, not, directly or indirectly, (A) initiate, solicit, or knowingly encourage (including by way of furnishing non-public information) the submission of any inquiries regarding, or the making of any proposal or offer that constitutes, or would reasonably be expected to lead to, a Takeover Proposal, (B) engage in, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any other Person any non-public information in connection with, or for the purpose of, encouraging a

Takeover Proposal or (C) enter into any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement or other similar agreement in connection with a Takeover Proposal. Without limiting the foregoing, it is agreed that any violation of the restrictions in this Section 5.02 applicable to the Company by any of the Company's controlled Affiliates or any of its other Representatives, to the extent acting on its behalf or at its direction, shall be deemed to be a breach of this Section 5.02 by the Company.

139. In addition, the Merger Agreement contained a "matching rights" provision that served as a deterrent to any alternative acquisition proposals. Pursuant to Section 5.02(e) of the Merger Agreement, Fresh Market could not revise or withdraw the Board's recommendation of the Transaction or terminate the Merger Agreement for a superior proposal without first providing Apollo with advance notice of the same, including the material terms and conditions of such proposal, as well as at least three business days to renegotiate the terms of its own proposal. Further, any amendment to the financial terms or other material terms of the alternative proposal requires a new notice period of two business days before an adverse recommendation change is made. Specifically, Section 5.02(e) provided that:

Neither the Board of Directors of the Company nor any committee thereof or subcommittee thereof shall (i) (A) withdraw (or modify in a manner adverse to Parent), or publicly propose to withdraw (or modify in a manner adverse to Parent), the Company Board Recommendation, (B) recommend the approval or adoption of, or approve or adopt, or publicly propose to recommend, approve or adopt, any Takeover Proposal or (C) fail to include the Company Board Recommendation in the Schedule 14D-9 or, if any Takeover Proposal has been made public, fail to reaffirm the Company Board Recommendation upon request of Parent within the earlier of three business days prior to the then scheduled Expiration Date or 10 business days after Parent requests such reaffirmation with respect to such Takeover Proposal (provided, however, that Parent may make such request only once with respect to such Takeover Proposal unless such Takeover Proposal is subsequently publicly modified in any material respect in which case Parent may make such request once each time such modification is made) (any action described in this clause (i) being referred to as an "Adverse Recommendation Change") or (ii) execute or enter into (or cause or permit the Company or any of its Subsidiaries to execute or enter into) any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement or other similar agreement in connection with a Takeover

Proposal, other than any Acceptable Confidentiality Agreement (each, a "Company Acquisition Agreement"). Notwithstanding the foregoing or any other provision of this Agreement to the contrary, prior to the Offer Acceptance Time, but not after, the Board of Directors of the Company or any committee thereof or subcommittee thereof may (I) make an Adverse Recommendation Change or (II) cause the Company to enter into a Company Acquisition Agreement with respect to a Takeover Proposal not solicited in violation of this Section 5.02 and terminate this Agreement pursuant to Section 7.01(d)(ii), in either case if the Board of Directors of the Company or any committee or subcommittee thereof has determined in good faith, after consultation with its financial advisors and outside legal counsel, that (x) in the case of clause (I) where the Adverse Recommendation Change is not made in response to a Takeover Proposal, failure to take such action would be inconsistent with the directors' fiduciary duties under applicable Law and (y) in the case of (A) clause (I) where such Adverse Recommendation Change is made in response to a Takeover Proposal or (B) clause (II), such Takeover Proposal constitutes a Superior Proposal; provided, however, that the Board of Directors of the Company or any committee thereof or subcommittee thereof shall not, and shall cause the Company not to, take any such action unless (1) the Company has given Parent at least three business days' prior written notice (an "Adverse Recommendation Change/Superior Proposal Notice") (it being understood and agreed that, in connection with an Adverse Recommendation Change in response to any Superior Proposal or any action contemplated by clause (II) of this Section 5.02(e), any material change to the financial or other material terms and conditions of such Superior Proposal shall require an additional Adverse Recommendation Change/Superior Proposal Notice (such one or more additional notices, an "Additional Notice") to Parent and a new two business day period) of its intention to take such action (which notice shall, (Y) in the case of an Adverse Recommendation Change in response to any Superior Proposal or any action contemplated by clause (II) of this Section 5.02(e), specify the identity of the party making such Superior Proposal and the material terms thereof and contain a copy of the agreement or proposal with respect to such Superior Proposal and, (Z) in the case of an Adverse Recommendation Change other than in connection with a Takeover Proposal, specify the basis for such Adverse Recommendation Change), (2) the Company has negotiated, and has caused its Representatives to negotiate, in good faith with Parent during such notice period, to the extent Parent wishes to negotiate, to enable Parent to propose in writing a binding offer to effect revisions to the terms of this Agreement, the Financing Letters and the Limited Guarantee such that, if a Superior Proposal has been made, it would cause such Superior Proposal to no longer constitute a Superior Proposal and, in connection with an Adverse Recommendation Change, it would cause the Board or such committee or subcommittee no longer to believe that the failure to make an Adverse Recommendation Change would be inconsistent with the directors' fiduciary duties under applicable Law, (3) following the end of such notice period, the Board of Directors of the Company or any committee thereof or subcommittee thereof shall have considered in good faith such binding offer, and shall have

determined that the Superior Proposal would continue to constitute a Superior Proposal, and in connection with an Adverse Recommendation Change, shall have determined that the failure to make an Adverse Recommendation Change would continue to be inconsistent with the directors' fiduciary duties under applicable Law, in each case if the revisions proposed in such binding offer were to be given effect; and provided, further, that any purported termination of this Agreement pursuant to this sentence shall be void and of no force and effect unless the termination is in accordance with Section 7.01 and, to the extent required under the terms of this Agreement, the Company pays Parent the applicable Company Termination Fee and Parent Expenses in accordance with Section 7.03 prior to or concurrently with such termination.

140. Moreover, the Merger Agreement contained an additional "information rights" provision. Pursuant to Section 5.02(d) of the Merger Agreement, promptly after the receipt by Fresh Market of any request for information or other inquiry that Fresh Market reasonably believed could lead to any proposal or other transaction, Fresh Market had to provide Apollo with: the material terms and conditions of any such request or inquiry; the identity of the person making any such request or inquiry; and copies of any written offer, proposal or request, or inquiry. Thus, Apollo could easily match any competing offer because it was granted unfettered access to the offer, in its entirety, and had significant matching rights that eliminate any leverage that Fresh Market potentially had in receiving a competing offer. Specifically, Section 5.02(d) provided that:

> At any time prior to the Offer Acceptance Time, the Company shall promptly notify Parent in writing in the event that the Company or any of its Subsidiaries or its or their Representatives receives a Takeover Proposal (but in any event within one business day after Knowledge of the Company of the receipt of such Takeover Proposal) and shall disclose to Parent the material terms and conditions of any such Takeover Proposal (including a copy thereof and any financing commitment papers submitted therewith, if such Takeover Proposal is in writing) and the identity of the Person or group of Persons making such Takeover Proposal, and the Company shall keep Parent informed on a reasonably prompt basis of any material developments with respect to any such Takeover Proposal (including any material changes thereto) (and the Company shall as promptly as practicable after Knowledge of the Company of the receipt thereof provide Parent with copies of any material written materials relating to such Takeover Proposal or any material change to the financial or other material terms and conditions

44

thereof).  For the avoidance of doubt, all information provided to Parent pursuant to this Section 5.02(d) will be subject to the terms of the Confidentiality Agreement.

141.    Section 7 provided that under specified circumstances, including if Fresh Market terminated the Merger Agreement to approve or recommend a superior proposal, Fresh Market had to pay a termination fee of $34 million. This provision, coupled with the "no-shop" provision, "matching rights" provision, and "information rights" provision, as well as the Company's artificially depressed valuation; the Berrys' willingness to only engage with Apollo; and the prohibition on contacting potential sources of funding constituted manipulative conduct that all but ensured that no competing offer was made to acquire shareholder's equity in Fresh Market.  Compounding the foregoing issues, the tender-offer transaction structure minimized the amount of time the Transaction was pending and thus made it even more difficult for any other party to come forward with a competing offer.

## I.    The Incomplete and Materially Misleading 14D-9

142.    On March 25, 2016, Fresh Market filed the 14D-9 with the SEC in connection with the Transaction recommending that Company's stockholders tender their shares in the Transaction. However, the 14D-9 failed to disclose material information to the stockholders of the Company preventing them from making an informed decision regarding the Transaction.

*Omissions Concerning the Background of the Proposed Transaction*

143.    Specifically, the 14D-9 failed to provide material information concerning the process conducted by the Company and the events leading up to the Transaction.  In particular, the 14D-9 misrepresented the extent of negotiations between Apollo and R. Berry.  In the "Reasons for Recommendation" section of the 14D-9, it stated:

> there were restrictions on the ability of the equity funds managed by [Apollo] (and other potential bidders) to enter into any discussions or arrangements

45

regarding an equity rollover with Ray Berry, Brett Berry and any other stockholders without the Strategic Transaction Committee's or the consent [sic], and that no such negotiations took place prior to the execution of the Merger Agreement[.]

Unbeknown to stockholders, R. Berry and Apollo had at least four conversations before the Merger Agreement was executed, at least two conversations in which the topic of R. Berry participating in a transaction through an equity rollover came up, and one discussion in which R. Berry agreed that he would roll his equity interest over into the surviving entity if Apollo was successful in agreeing to a transaction with Fresh Market. Further, R. Berry facilitated conversations between his son, B. Berry, and Apollo.

144.    The 14D-9 also failed to disclose R. Berry's pre-October 2015 communications with other potential acquirors and his statements to the Board that he preferred Apollo. Unbeknownst to stockholders, R. Berry had been in communication with other potential acquirors before the Board's October 15, 2015 meeting and had decided to favor Apollo. And the October 16, 2015 *Reuters* article reflects that R. Berry had in fact reached out to multiple private equity firms about taking the Company private during the summer of 2015.

145.    The 14D-9 also failed to disclose R. Berry's false representations to the Board about the extent of his knowledge of communications between B. Berry and Apollo. R. Berry was not only aware that Apollo had conversations with B. Berry, but he had actually prompted them.

146.    The 14D-9 did not disclose the existing pressure on the Board from activist stockholders to sell the Company. The 14D-9 only stated that at its October 15, 2015 meeting, the Board considered "that TFM *could* become the subject of shareholder pressure and communications" [emphasis added]. At that point in the process, the Board was already aware of, and was influenced by, actual stockholder pressure and had received formal demands to shop

46

the Company, including a letter from Neuberger, one of the Company's significant stockholders.

147. The 14D-9 failed to disclose R. Berry's threat in late November 2015 to sell his shares and tank the stock price if the Board did not agree to sell the Company.

148. The 14D-9 stated that R. Berry had indicated he would "consider rolling his equity interest over" in a transaction with a party other than Apollo, but failed to disclose that R. Berry would only do so if he had confidence in the acquiror or that R. Berry already expressed that he was not aware of any other potential private equity buyer with whom he was comfortable engaging in an equity rollover.

149. The 14D-9 also omitted that R. Berry lied to the Board about his agreement with Apollo in October 2015. The 14D-9 disclosed that on October 5, 2015, R. Berry told Fresh Market's general counsel that he had told Apollo he "would consider an equity rollover depending upon the terms," and at the October 15, 2015 Board meeting, R. Berry "reiterated that he had not committed to any transaction with [Apollo] (or any other potential bidder)." The 14D-9 omitted, however, that the Board received communication between R. Berry's counsel and the Board's counsel stating that R. Berry had a conversation with Apollo and already agreed that he would roll his equity interest over into the surviving entity.

150. The 14D-9 also failed to disclose R. Berry's conversation in late December 2015 with Defendant Anicetti when R. Berry tried to pressure the Board toward a quick sale to Apollo.

*Omissions Concerning Management Projections*

151. The 14D-9 also failed to disclose key information regarding the projections prepared by Fresh Market management and provided to, and relied upon, by J.P. Morgan. Specifically, the 14D-9 omitted that the November 17 Management Case, presented at the Board's December 1 and 2, 2015 meeting, already reflected a "15% overall risk adjustment, with

47

different initiatives receiving different risk weighting based on likelihood of achievability." By failing to disclose the risk adjustments built into the November 17 Management Case, the 14D-9 misled Fresh Market's public stockholders into believing that the various downside scenarios created by management and J.P. Morgan were appropriate and reasonable ways to sensitize overly optimistic forecasts for their risk of execution. In fact, the additional risk adjustments applied to Fresh Market's management forecasts were designed to deceive Fresh Market's public stockholders into believing that the consideration they received in the Transaction was fair.

152. The 14D-9 misleadingly states that, on December 1, 2015, management and J.P. Morgan reviewed for the Board "sensitivities . . . in the event that revenue or gross margin fell short of what was reflected in the November 17 Management Case." In fact, the revenue growth and EBITDA margin sensitivities reviewed at that Board meeting ranged from -3% to +1%.

*Other Omissions*

153. The 14D-9 also failed to disclose: (i) that J.P. Morgan was providing wealth management services to R. Berry, or the consideration received for such services; (ii) J.P. Morgan's investments and trades in Apollo securities during the period it was advising Fresh Market on the Transaction; and (iii) J.P. Morgan's investments and trades in Fresh Market securities during the period it was advising Fresh Market on the Transaction.

## FIRST CAUSE OF ACTION

### (Violations of Sections 14(e) of the Exchange Act)

154. Plaintiffs repeat and reallege each allegation set forth herein.

155. During the relevant period, Defendants, or, with respect to the Apollo Defendants, an entity they subsequently acquired, disseminated the false and misleading 14D-9 specified above, which failed to disclose material facts necessary in order to make the statements made, in

48

light of the circumstances under which they were made, not misleading in violation of section 14(e) of the Exchange Act and SEC Rules promulgated thereunder.

156.    By virtue of their positions within Fresh Market, Defendants were aware of this information and of their duty to disclose this information in the 14D-9. The 14D-9 was prepared, reviewed, and/or disseminated by Defendants. The 14D-9 misrepresented and/or omitted material facts, including, among other things, material information about the unfair sale process for the Company, the unfair consideration offered in the Transaction, and the actual intrinsic value of the Company's assets. Defendants were at least negligent in filing the 14D-9 with these materially false and misleading statements. Defendants also failed to correct the 14D-9 and the failure to update and correct false statements is also a violation of Section 14(e) of the Exchange Act and SEC Rules promulgated thereunder.

157.    The omissions and false and misleading statements in the 14D-9 were material in that a reasonable stockholder would consider them important in deciding whether to tender their shares in the Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 14D-9 and in other information reasonably available to stockholders.

158.    As a result of the actions of Defendants, Plaintiffs and the Class sold or were forced to sell their shares of Fresh Market common stock at an inadequate price due to Defendants' false and misleading statements, material omissions and manipulative conduct.

## SECOND CAUSE OF ACTION

### (Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9)

159.    Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

49

160.     Defendants, or, with respect to the Apollo Defendants, an entity they subsequently acquired, issued the 14D-9 with the intention of soliciting shareholder support for the Transaction.

161.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

162.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

163.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

164.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

165.     The 14D-9 violated Section 14(d)(4) and Rule 14d-9 because it omitted material

facts, including those set forth above, which omissions rendered the 14D-9 false and/or misleading.

166.    Defendants knowingly, or with deliberate recklessness, omitted the material information identified above from the 14D-9, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Transaction, they allowed it to be omitted from the 14D-9, rendering certain portions of the 14D- 9 materially incomplete and therefore misleading.

167.    The misrepresentations and omissions in the 14D-9 were material to Plaintiffs and the Class, and Plaintiffs and the Class were deprived of their entitlement to make a fully informed decision.

### THIRD CAUSE OF ACTION

### (Against the Director Defendants for Violation of Section 20(a) of the Exchange Act)

168.    Plaintiffs repeat and reallege each allegation set forth herein.

169.    The Director Defendants acted as controlling persons of Fresh Market within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers or directors of Fresh Market and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the 14D-9 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends were false and misleading.

170.    Each of the Director Defendants was provided with or had unlimited access to copies of the 14D-9 and other statements alleged by Plaintiffs to have been misleading prior to or

51

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

171.     In particular, each of the Director Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The 14D-9 at issue contains the unanimous recommendation of each of the Director Defendants to approve the Transaction. They were, thus, directly involved in the making of this document.

172.     In addition, as the 14D-9 sets forth at length, and as described herein, the Director Defendants were each involved in negotiating, reviewing, and approving the Transaction. The 14D-9 purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Director Defendants.

173.     By virtue of the foregoing, the Director Defendants have violated section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand relief in their favor and in favor of the Class and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a Class action and certifying Plaintiffs as Class representative;

B.     Rescinding the Transaction or any of the terms thereof, or granting Plaintiffs and the Class rescissory damages;

D.     Directing Defendants to account to Plaintiffs and the Class for all damages suffered as a result of the wrongdoing;

E.     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorney' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs pray for a jury trial on all issues and in all proceedings so triable.


This the 2nd day of March, 2017.

WILSON RATLEDGE, PLLC
By:     /s/ Michael A. Ostrander
          *(Signed Electronically)*
          Michael A. Ostrander
          State Bar No. 36259
          Attorney for Plaintiffs
          4600 Marriott Drive, Suite 400
          Raleigh, North Carolina 27612
          Telephone: (919) 787-7711
          Facsimile: (919) 787-7710
          mostrander@wrlaw.com

          BROWER PIVEN
          A Professional Corporation
          David A.P. Brower
          Daniel Kuznicki
          475 Park Avenue South, 33rd Floor
          New York, NY 10016
          Tel. (212) 501-9000

          *Counsel for Plaintiffs*

          RIGRODSKY & LONG, P.A.
          Seth D. Rigrodsky
          Brian D. Long
          Gina M. Serra
          Jeremy J. Riley
          2 Righter Parkway, Suite 120
          Wilmington, DE 19803
          (302) 295-5310

          *Additional Counsel for Plaintiffs*

54